UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

**R. ALEXANDER ACOSTA**
Secretary of Labor,
United States Department of Labor

                Plaintiff,                Case No. 16-cv-11552

v.                                  Hon. Thomas L. Ludington
                                  Hon. Patricia T. Morris

**TIMBERLINE SOUTH LLC**, a Michigan
limited liability company, and
**JIM PAYNE**, an individual,

                Defendants.

_____/

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN PART, DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, GRANTING PLAINTIFF'S MOTION TO AMEND, DENYING PLAINTIFF'S MOTION TO STRIKE, DIRECTING SUPPLEMENTAL BRIEFING AND ENJOINING DEFENDANT FROM VIOLATING OVERTIME AND RECORDKEEPING PROVISIONS**

On April 29, 2016, Plaintiff Secretary of Labor filed a Complaint in this Court against Defendants Timberline South LLC, a timber felling concern, and its manager Jim Payne, alleging violations of the overtime and recordkeeping provisions of the Fair Labor Standards Act of 1938. The Wage and Hour Division of the Department of Labor ("Wage and Hour") initiated an investigation of Timberline's employee compensation practices in July 2015. Investigators Jeffrey Wrona and Randy Whitemire conducted the investigation, which included the time period from August 25, 2013 through August 20, 2015 (the "Investigation Period"). The investigators concluded that Timberline employees frequently worked in excess of forty hours per week, Timberline did not pay any of its employees a rate of one and one-half times their regular rate for hours worked beyond forty hours per week, and that Timberline did not maintain records of hours worked for most non-hourly employees. Plaintiff seeks recovery of unpaid

overtime compensation in amount of $468,595.08, an equal amount of liquidated damages, and injunctive relief restraining Defendants from further violations of the Act.

Plaintiff moved for summary judgment on April 19, 2017, asserting that the facts giving rise to liability are not in dispute, as it is apparent from the face of the employer's records that Defendants failed to comply with the overtime and recordkeeping provisions of the FLSA. Defendants moved for summary judgment on April 20, 2017, asserting that Timberline is not a covered enterprise under the FLSA or is exempt from the FLSA under numerous provisions. The parties agree that Timberline operations are conducted wholly within the state of Michigan, and that Timberline purchases and uses equipment manufactured out of state. The parties dispute whether purchasing and using equipment manufactured out of state subjects Timberline to FLSA coverage, and dispute the applicability of various exemptions under the FLSA. The parties dispute whether the Wage and Hour Investigators used reliable methods to calculate overtime due. Finally, the parties dispute whether Defendants made a good faith and reasonable determination that the wage and hour provisions of the FLSA do not apply to Timberline operations, so as to insulate them from liability for liquidated damages.

Plaintiff filed a Motion to Strike on May 11, 2017, seeking to strike certain exhibits attached to Defendants' Motion for Summary Judgment, and the portions of Defendants' Motion for Summary Judgment that rely on such evidence. Specifically, Plaintiff seeks to strike the USDOT Company Snapshot of Timberline Logging, Inc., and portions of Jim Payne's affidavit stating that Timberline drivers maintain CDL licenses. These documents were produced for the first time as an attachment to Defendants' Motion for Summary Judgment. Defendants rely on this evidence in their Motion for Summary Judgment to support the argument that Timberline drivers are subject to the Secretary of Transportation's authority to set qualifications and

maximum hours and, therefore, that its drivers are exempt from the overtime provisions of the FLSA under the Motor Carrier Exemption.

Plaintiff filed a Motion to Amend Complaint on April 19, 2017. Plaintiff's Proposed Amended Complaint seeks 1) to add additional employees and former employees of Defendants identified during discovery to whom Plaintiff alleges overtime compensation is due; 2) to allege additional recordkeeping violations of the Act identified during discovery; and (3) to amend the Complaint to conform to facts identified during discovery. Defendants oppose the Motion on grounds of futility, undue delay, and prejudice.

For the reasons that follow, Plaintiff's Motion for Summary Judgment will be granted in part and denied in part; Defendants' Motion for Summary Judgment will be denied; Plaintiff's Motion to Strike will be denied; Plaintiff's Motion to Amend will be granted; supplemental briefing on damages will be ordered; and Defendants will be enjoined from further violations of the overtime and record keeping provisions of the Act.

## I.

### A.

Defendant Timberline South, LLC ("Timberline") is organized as a Michigan limited liability company and is based in Gaylord, MI. Pl.'s Mot. Summ. J. at 2, ECF No. 18; Defs.' Mot. Summ. J. at 4, ECF No. 19. Timberline engages exclusively in harvesting and felling raw timber and delivering the timber to mills located solely within the state of Michigan. Def. Mot. at 2. Timberline harvests the timber from professionally managed timber stands owned by state and private entities. *Id.* Timberline is a small business employing less than thirty employees at any given time. *Id.* Prior to the formation of Defendant Timberline South, LLC, Defendant Payne operated a company known as Timberline Logging, Inc., ("Timberline Logging"), a timber

harvesting business based in Tennessee. Pl.'s Mot. at 2, 6. Timberline Logging went out of business in 2010. Timberline South, LLC was founded at or about the same period of time. *Id.* Timberline's business operations occur solely within the state of Michigan. *Id.*

Defendants have no financial or ownership interest in the mills they deliver timber to. Pl.'s Mot. at 3; Defs.' Mot. at 4. The equipment used by Timberline in its logging operations, including harvesters and forwarders, was purchased in Michigan but manufactured outside Michigan. Pl's Mot. at 3–4; Defs.' Mot. at 3. It is undisputed that Timberline qualifies as an "enterprise" under Section 203(r)(1) of the Act. Defs.' Resp. at 2, ECF No. 24. It is undisputed that Timberline is also an "employer" under Section 203(d) of the Act. *Id.* Timberline has had an annual gross volume of sales of more than $500,000 for each year relevant to this litigation. Pl.'s Mot. Ex. B (Defs.' Admiss.) at 4, ECF No. 18-3; Ex. E (Defs.' Interrogs.) at 10, ECF No. 18-6.

Timberline employees work in a variety of roles including equipment operators, loaders, mechanics, truck drivers, and administrative staff. Pl.'s Mot. at 3; Defs.' Mot. at 5, 12, 18. More than eight Timberline employees are engaged in felling operations during each workweek of the Investigation Period. Defs.' Resp. at 16. Timberline's administrative employees are paid on an hourly, not salary basis. Pl.'s Mot. Ex. C (Payne Tr.) at 96, ECF No. 18-4; Ex. G (Empl. Hrs. and Gross) at 1, 26, 51, ECF No. 18-8. Timberline's trucks operate under USDOT registration numbers, and its drivers maintain Commercial Drivers Licenses ("CDLs"). Defs.' Mot. Ex. DX 6 (USDOT Registration Numbers), ECF No. 19-7; Def. Resp. at 12.

Some Timberline employees are paid hourly rates, some non-hourly rates, and some a combination of hourly rates as well as day, cord, piece, and/or load rates. Pl's Mot. at 4; Ex. I (Payroll Journal), ECF No. 18-10; Defs.' Mot. at 4. Defendants recorded hours worked for hourly employees. Pl's Mot. Ex. P (Wrona Decl.) ¶¶ 10–17; ex. Q (Wage and Hour Form 55).

Defendants did not record hours worked for most non-hourly employees, did not compute regular hourly rates for employees, and have never paid an overtime wage of one and one-half times the regular hourly rate for hours worked beyond forty. Payne Tr. at 168–170, 280. Defendants assert they did not compute a "regular [hourly] rate," because Timberline's compensation structure included compensation for travel to work time, lunch pay, fuel, daily rates, piece rates, and a company mobile phone. Payne Aff. ¶ 11–12.

**B.**

Wage and Hour initiated an investigation of Timberline in July 2015 that covered the time period from August 25, 2013 through August 20, 2015 (the "Investigation period"). Pl's Mot. at 9; Def. Mot. at 2. Investigator Wrona calculated overtime wages due to hourly employees based on payroll records produced by the Defendants as well as interviews with employees. Wrona Decl. ¶¶ 10–17; Wage and Hour Form 55. Wrona calculated overtime wages due to non-hourly employees based upon employee interviews. Wrona Decl. ¶¶ 10–17.

> For example, for an employee working 60 hours and earning $1,500 in a given week, I would determine the regular rate by dividing 1,500 by 60, to obtain a regular rate of $25 per hour. Then I would multiply half the regular rate that week, $12.50, by the number of overtime hours worked, 20, to determine back wages due that workweek of $250.

Id. Mr. Wrona knew that employee estimates often included drive time and meal time, which were included in his calculations. Def. Mot. Ex. DX-5 (Wrona Dep.) at 53–54. For some employees paid a combination of hourly, cord, and day rates, when he did not estimate hours worked based on an interview Mr. Wrona divided gross pay for a workweek by the hourly rate to determine hours worked. *Id*. at 57–58. In one case, Mr. Wrona divided a gross pay of $2,448 by an hourly rate of $22.00 to determine that the employee worked 111.27 hours that week. *Id*. He

then multiplied the hours in excess of 40, or 71.27, by a 0.5 multiplier to calculate the overtime due. *Id*.

The record contains declarations of eight employees and a deposition of one employee containing estimated hours worked. Pl's Mot. Ex. O (Empl. Decl.), ECF No. 18-16; Ex. U (Cheryl Klein Dep.), ECF No. 18-22. "Wage and Hour ultimately determined that Defendants failed to pay $468,595.08 in back wages to fifty employees through March 17, 2017." Wrona Decl. ¶¶ 10–17; *see* Wage and Hour Form 55.

## C.

Plaintiff also seeks liquidated damages on the grounds that Defendants did not make a good faith and reasonable determination that the provisions of the FLSA did not apply to Timberline. Prior to the formation of Timberline South, LLC, office manager Lorrie Grubbe, at the request of Defendant Payne, sent an email to Timberline Logging, Inc.'s accountant, Mr. Rooyakker, asking "do you know if we would be exempt under FLSA in Tennessee." Pl.'s Mot. at 6, Ex. K (Rooyaker email), ECF No. 18-12; Def. Mot. at 3. Mr. Rooyaker informed Defendant Payne that Timberline Logging, Inc. was exempt from overtime obligations based on an agricultural exemption. *Id*. Mr. Rooyaker did not offer an opinion about which specific employees of Timberline Logging, Inc. were subject to the exemption, the applicability of the exemption to Timberline South, LLC, or the applicability of any other exemption. Pl.'s Mot. Ex. L (Rooyakker Tr.) at 61–62, ECF No. 18-13.

Mr. Rooyaaker did not instruct Mr. Payne to not pay time and one-half for his employees. He left the decision to "Jim Payne and his personnel" to determine what employees the agricultural exemption applied to. *Id*. at 80. Mr. Payne established Timberline's compensation and recordkeeping practices without consulting Mr. Rooyakker. Defs.' Admiss. at 2–3; Payne Tr.

at 173. Mr. Payne did not believe that truck drivers were agricultural employees. Payne Tr. at 306. Mr. Payne read parts of U.S. DOL Fact Sheet #19 on the Motor Carrier Exemption, but does not recall whether he did so prior to initiation of the DOL investigation. Payne Tr. at 351–54.

## II.

### A.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52.

### B.

The Fair Labor Standards Acts compels covered employers to provide overtime pay to any non-exempt employee who works more than forty hours per workweek for "employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1); *Jewell Ridge Coal Corp. v. Local No. 6167*, 325 U.S. 161, 167 (1945). In an action by the employee to recover unpaid wages under the FLSA, the employee "must prove by a preponderance of evidence that he or she performed work

for which he was not properly compensated." *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 551 (6th Cir. 1999) (citing *Anderson v. Mt. Clemens Potter Co.*, 328 U.S. 680, 686–87 (1946)).

**1.**

The FLSA overtime provisions do not apply to all employers, but apply only to enterprises "engaged in commerce or in the production of goods for commerce." Section 29 U.S.C. § 203(s)(1)(A)(i). Such an enterprise includes one that "has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; is an enterprise whose annual gross volume of sales made or business done is not less than $500,000." Id.

"Since its original enactment in 1938, Congress has amended the FLSA three times, each time enlarging the number of entities subject to coverage under the Act." *Polycarpe v. E&S Landscaping Serv., Inc.*, 616 F.3d 1217, 1220 (11th Cir. 2010). The Act initially defined coverage solely in terms of covered employees, as opposed to covered employers. *Id.* Employees were covered if they were engaged in commerce or the production of goods for commerce. *Id.* Congress amended the act in 1961 to provide for enterprise wide coverage for employers with two or more workers engaged in commerce or the production of goods for commerce. *See* Fair Labor Standards Amendments of 1961, Pub.L. No. 87–30, 75 Stat. 65 (1961).

The 1961 amendments also added another alternative avenue for enterprise coverage to attach, which has become known as the "handling clause." *Polycarpe* at 1220. The handling clause extends coverage to any enterprise who "has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person." 29 U.S.C. § 203(s)(1)(A)(i). This amendment has been interpreted to allow the FLSA

"potentially to reach retail and service businesses that were otherwise locally focused." *Polycarpe*, 616 F.3d at 1220 (citing *Dunlop*, 516 F.2d at 501).

Congress amended the Act again in 1974, substituting the word "or" for the word "including" directly before the handling clause. *See* Fair Labor Standards Amendments of 1974, Pub.L. 93–259, 88 Stat. 55 (1974). This implemented Congress's intent that the handling clause provided a second independent avenue for enterprise coverage to attach. *Polycarpe* at 1221. Contrary to the first half of section 203(s)(1)(A)(i), which applies only to employees engaged in commerce or production of goods for commerce, the handling clause applies to enterprises whose employees have handled goods and materials that have moved through commerce, even if they cease to so move after coming into possession of the enterprise and its employees. *Id*.

The 1974 amendment also added the words "or materials" to the handling clause. *Id*. Prior to the 1974 amendments the handling clause applied to enterprises with employees handling, selling or working on "goods" that had moved in interstate commerce. *Id*. After the 1974 amendments, the handling clause extended coverage to enterprises with employees handling, selling, or working on "goods *or materials*" that had moved in interstate commerce. *Id*.

§203(i) provides an exception to the applicability of the handling clause in its definition of goods, excluding "goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer or processor thereof." 29 U.S.C. § 203(i). Thus, an enterprise would not be considered engaged in commerce under the handling clause simply by virtue of handling goods that have moved through commerce if the enterprise is the ultimate consumer thereof. *Id*. This is often referred to as the "ultimate-consumer" exception. *Id*.

Notably, the text only provides an ultimate-consumer exception for goods, and not for materials. Although "materials" is undefined in the Act, the Senate report provides one example: "soap used by a laundry." S. Rep. No. 93–690, at 17 (1974) (internal citations omitted). Case law has interpreted "materials" under the Act to mean "tools or other articles necessary for doing or making something." *Polycarp* at 1224. The context of the article's use must be considered to determine if it is a material. *Id*. For instance, a china plate used by a catering business to serve customers is a "tool[] or other article[] necessary for doing or making something," whereas a decorative china plate hung on a wall is not. *Id*. Additionally, an article that constitutes a material under the above definition must also bear a significant connection with the enterprise's commercial activity; "the business may not just somehow internally and incidentally consume the item." *Polycarp* at 1226.

The case law and senate report reflect that the statute is not to extend to incidental consumption by an enterprise such as hand soap used in a restroom, which would be subject to the ultimate consumer exception as a good. Rather the intent is to cover articles or equipment used in the enterprise's commercial activity. Such use by an enterprise renders the article a material, rather than a good, and the enterprise is therefore engaged in commerce under the Act.

Courts have concluded that enterprises are engaged in commerce under the Act where their employees handled and used equipment purchased locally which had previously moved through commerce. *E.g.*, *Dole v. Morefield Const. Co.*, 745 F. Supp. 1231 (E.D. Mich. 1990) (finding construction company engaged in commerce under the Act despite primarily conducting intra-state business where its employees handled and used trenchers, bulldozers, and other machinery manufactured out of state); *Donovan v. Pointon*, 717 F.2d 1320, 1322 (10th Cir. 1983) (affirming district court's holding that construction company was engaged in commerce where it

used locally purchased equipment and replacement parts that were manufactured out of state); *Marshall v. Brunner*, 668 F.2d 748, 751 (3d Cir. 1982) (affirming district court's holding that garbage collection company was engaged in commerce where it used trucks, truck bodies, tires, batteries and accessories manufactured out of state); *Polycarpe v. E&S Landscaping Serv., Inc.* 616 F.3d 1217, 1228 (11th Cir. 2010) (directing district court to consider on remand the location where landscaping company's lawn mowers, edgers, and trucks were manufactured in order to determine whether the enterprise was engaged in commerce).

The "coming to rest" theory is an erroneous legal theory at odds with the amended text of 29 U.S.C. § 203(s)(1)(A)(i). The theory rests on an incorrect belief that goods transported through interstate commerce lose their interstate character once they have "come to rest" locally. *Polycarpe* at 1221; s*ee Donovan v. Scoles*, 652 F.2d 16, 18 (9th Cir.1981) (stating that this doctrine was appropriate when FLSA coverage depended not on enterprise coverage, but only on individual coverage: employees who were "engaged in commerce or the production of goods for commerce"). This doctrine has been rejected in the enterprise coverage context as based on an incorrect reading of the amended FLSA. *Polycarpe* at 1221. "[T]he legislation was designed to regulate enterprises dealing in articles *acquired intrastate* after travel in interstate commerce." *Id.* (citing *Brennan v. Greene's Propane Gas Serv., Inc.*, 479 F.2d 1027, 1030 (5ᵗʰ Cir. 1973); *see also* 29 C.F.R. § 779.242 (stating that it is "immaterial ... that the goods may have 'come to rest' ").

Notably, the language of the latter half of the handling clause is in the past tense, providing that an enterprise is engaged in commerce where it "has employees handling, selling, or otherwise working on goods or materials that *have been moved in or produced for commerce by any person*." 29 U.S.C. § 203(s)(1(A)(i) (emphasis added). The plain language of the statute

imposes no continuous movement requirement. The handling clause is still operative where a good or material ceases to move through commerce and "comes to rest" locally where it is then purchased by an enterprise. Where such a good or material had at one point been moved through commerce, and an enterprise's employees handle or use such a good or material in enterprise operations, the enterprise is engaged in commerce under the Act. *Polycarpe* at 1228.

**2.**

The FLSA provides a number of exemptions to its overtime provisions. An employer who falls within the broad scope of enterprise coverage under § 203(s)(1)(A)(i) may nonetheless be exempt from the overtime provisions if it qualifies for an exemption. Particular employees may also be exempt. Defendants believe the following exemptions apply in this case: i) the Forestry Exemption; ii) the Agricultural Exemption; iii) the Administrative Employees Exemption; and iv) the Motor Carrier Exemption.

**i)**

The forestry exemption applies to

> any employee employed in planting or tending trees, cruising, surveying, or felling timber, or in preparing or transporting logs or other forestry products to the mill, processing plant, railroad, or other transportation terminal, if the number of employees employed by his employer in such forestry or lumbering operations *does not exceed eight*[.]

29 U.S.C. § 213(b)(28) (emphasis added). Additionally, 29 C.F.R. § 788.13 provides guidance on the methodology for counting employees:

> The determination of the number of employees employed in the named operations is to be made on an occupational and a workweek basis. Thus the exemption will be available in one workweek when eight or less employees are employed in the exempt operations and not in another workweek when more than that number are so employed.

- 12 -

The C.F.R. further states that all enterprise employees employed each workweek count toward the eight employee total, irrespective of whether any employee is engaged in exempt operations.

> Thus if an employer employs four employees in felling timber and preparing logs at one location and five at another location in those operations, the exemption would not be available. Similarly, if he employs six employees in such operations and three other employees in transportation work as discussed in § 788.11, the exemption could not apply. Under such circumstances he would be employing more than eight employees in the named operations. *The fact that some of these employees may not be engaged in commerce or the production of goods for commerce or may be engaged in other exempt operations will not affect these conclusions* (Woods Lumber Co. v. Tobin, 199 F. 2d 455 (C.A. 5))

29 C.F.R. § 788.13 (emphasis added). The same analysis applies where an employee engages in some exempt activities and some non-exempt activities. *Camargo v. Trammell Crow Interest Co.*, 318 F. Supp. 2d 443, 447 (E.D. Tex. 2004) ("If an employee in the same work week performs both work which is exempt from overtime requirements and work that is not exempt, he is not exempt that week, and the overtime pay requirements of the FLSA are applicable") (citing 29 C.F.R. § 780.11).

### ii)

The Agricultural Exemption applies in part "to any employee employed in agriculture." 29 U.S.C. § 213(b)(12). Agriculture is defined as

> farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 1141j(g) of Title 12), the raising of livestock, bees, fur-bearing animals, or poultry, *and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations*, including preparation for market, delivery to storage or to market or to carriers for transportation to market

29 U.S.C. § 203(f) (emphasis added). The definition contains two parts. Part one, also known as the primary meaning, refers to farming in all its branches. *Farmers Reservoir & Irrigation Co. v.*

- 13 -

*McComb*, 337 U.S. 755, 762 (1949). The secondary meaning includes any other practices performed by a farmer as incident to or in conjunction with farming operations.

### iii)

The Administrative Employee Exemption applies, in relevant part, to "any employee employed in a bona fide executive, administrative, or professional capacity . . ." The Code of Federal Regulations provides guidance on the meaning of "bona fide" administrative professional, limiting the application to employees "compensated on a salary or fee basis at a rate of net less than $455 per week . . ." 29 C.F.R. § 541.200.

### iv)

29 U.S.C. § 213(b)(1) provides an exemption from the FLSA's overtime provisions for "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service" (the "Motor Carrier Exemption"). 29 U.S.C. § 213(b)(1). The Secretary has jurisdiction over transportation of passengers or property by motor carrier into interstate commerce. *See* 49 U.S.C.A. § 13501.

Transportation into interstate commerce includes crossing state lines, and also includes intrastate transportation that forms a "practical continuity of movement" across state lines from the point of origin to the point of destination. 29 C.F.R. § 782.7. A "practical continuity of movement exists" where intrastate delivery is merely a "convenient intermediate step in the process of getting [the goods] to their final [interstate] destination." *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943).

The regulatory authority of the DOT is broad, including, for example, the authority to regulate hazardous materials transportation. Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.* This broad authority to regulate transportation is not necessarily co-extensive with

the Secretary's authority to establish maximum hour requirements for motor carriers in interstate commerce, as explained by the First Circuit:

> The motor carrier exemption applies only when the Secretary "has power to establish qualifications and maximum hours of service" pursuant to 49 U.S.C. § 31502. 29 U.S.C. § 213(b). Whether the Secretary has power to conduct other business and promulgate unrelated regulations within Puerto Rico is irrelevant to this inquiry, and does not create ambiguity from plain meaning.

(*Herman v. Hector I. Nieves Transp., Inc.*, 244 F.3d 32, 36 (1st Cir. 2001).

Thus, an enterprise whose truck drivers are subject to some degree of regulation by the Department of Transportation does not automatically subject the enterprise to the Secretary of Transportation's power to establish maximum hours of service. The Secretary only has such power over motor carriers transporting passengers or property in interstate commerce, and only those motor carriers are exempt from FLSA overtime provisions by the Motor Carrier Exemption. *See* 49 U.S.C.A. § 13501.

## III.

Defendants argue that Timberline is not a covered enterprise under 29 U.S.C. 203(s)(1). Their argument rests on four main premises. First, they argue Timberline is not directly engaged in commerce, as Timberline operates wholly within the state of Michigan and the raw timber that its employees transport is never moved across state lines. Def. Mot. at 9. Second, although Defendants admit that Timberline employees use business equipment that has moved in interstate commerce, they do not themselves move equipment or goods into commerce, a fact which Defendants believe to be dispositive. Resp. at 7–8. Third, Defendants assert that Timberline employees' engagement in commerce, if any, is "de minimis," and is too many steps removed from interstate commerce for Timberline to be subjected to the FLSA provisions. Def. Mot. at 12. Fourth, Defendants assert that Timberline is the "ultimate consumer" of its business

- 15 -

equipment, and as such the use of equipment manufactured out of state does not subject Timberline to FLSA coverage. Resp. at 8.

Defendants also assert that Timberline employees are covered by a variety of exemptions under the FLSA. Defendants assert that Timberline is covered by the Forestry Exemption, despite the fact that it only applies to forestry operations with eight or fewer employees. Defendants theorize that Timberline's allegedly exempt employees do not count toward the eight employee limit for the purposes of the Forestry Exemption. Resp. at 16. Defendants assert that Timberline is also covered by the Agricultural Exemption, theorizing that harvesting and felling raw timber is analogous to harvesting any horticultural or agricultural commodity within the meaning of the Agricultural Exemption. *Id.* at 13–14. Finally, Defendants assert that Timberline is covered by the Administrative Employees Exemption, despite the fact that it applies only to salaried employees, and Timberline's sole administrative employee is paid on an hourly basis. *Id.* at ii.

Defendants also assert that Timberline drivers are covered by the Motor Carrier Exemption, as Timberline drivers are subject to regulation by the Secretary of Transportation. Def. Mot. at 12–16. They argue that *any* regulation by DOT, such as DOT registration numbers and CDL licensing, renders Timberline drivers subject to the Secretary of Transportation's authority to set qualifications and maximum hours within the meaning of the Motor Carrier Exemption.

Defendants also take issue with the methods used by the Investigators to calculate overtime due. *Id.* at 17–20. Defendants believe Timberline is entitled to set off "non-compensable" time and supplemental compensation against overtime due, including drive to work time, meal time, fuel reimbursements, and mobile phones. *Id.* Defendants also point out

that, in at least one case, the Investigators' calculation methods lead to overinflated and unreasonable estimates. *Id.* at 20–25. Defendants believe that their inquiry to Timberline's Accountant about the applicability of the FLSA satisfied their obligation under the FLSA. *Id.*

## A.

Here, Timberline is clearly a covered enterprise under the FLSA, as Timberline has "employees handling, selling, or otherwise working on goods or materials that *have been moved in or produced for commerce by any person*." 29 U.S.C. § 203(s)(1)(A)(i) (emphasis added). Specifically, Timberline employees use commercial equipment that has been manufactured out of state, including logging equipment such as harvesters and forwarders. Payne Tr. at 260; ex. F (Equip. List), ECF No. 18-7.

Defendants contend that the language "goods or materials" included in the handling clause refers to the thing being moved or produced by the enterprise, namely the raw timber. Defs.' Resp. at 7–8, ECF No. 24. They note that the raw timber never crosses state lines. *Id.* However, such a construction of the statute is inconsistent with the handling clause. Section 203(s)(1)(A)(i) sets forth two alternative avenues for enterprise coverage to attach: 1) direct engagement in commerce or production of goods for commerce; and 2) handling goods or materials that have travelled in commerce (the "handling clause"). If Timberline was moving its raw timber in interstate commerce, Timberline employees would be directly engaged in "producing goods for commerce" under the first clause of subsection (i). It is undisputed that Timberline does not fall under the first clause of subsection (i). Nevertheless, it falls under the "handling clause," as its employees handle goods or materials that have previously travelled in interstate commerce, namely business equipment.

Defendants also assert that the "ultimate consumer" exception applies to Timberline's use of business equipment manufactured out of state. In *Dunlop v. Industrial America Corp.*, the Fifth Circuit held that the garbage removal service was the "ultimate consumer" of gasoline and oil products used in operating and maintaining garbage trucks and therefore not engaged in commerce under the Act. *Dunlop v. Indus. Am. Corp.*, 516 F.2d 498 (5th Cir. 1975). *Dunlop* is factually distinguishable from the instant case as well as the decisions of the Eastern District of Michigan, the Tenth Circuit, and Third Circuit. Those courts have held that enterprises with wholly intra-state operations are engaged in commerce under the Act where their employees handled and used equipment purchased locally, which had previously moved through commerce. *E.g.*, *Dole*, 745 F. Supp. 1231 (bulldozers and trenchers in construction operations); *Donovan*, 717 F.2d at 1322; *Marshall*, 668 F.2d at 751 (trucks and truck bodies in a garbage collection operation).

In *Dunlop*, the use of gasoline and oil products in operating garbage trucks is more aptly characterized as "incidental consumption" than the use of a bulldozer in a construction operation, or the use of harvesters in a timber felling operation. The use of gasoline and oil does not bear a "significant connection to the enterprise's commercial activity." *Polycarp* at 1226. Any enterprise employing drivers in any capacity consumes gasoline and oil. Such consumption falls within the ultimate consumer exception as a good. However, the use of heavy machinery manufactured out of state in virtually all facets of Timberline business operations cannot properly be characterized as "incidental consumption" of a consumer good so as to fall within the ultimate consumer exception. *See Polycarp* at 1226. Timberline's use of such equipment bears a significant, indispensable connection to its commercial enterprise and thus falls outside of the ultimate consumer exception. *Id.*

Defendants concede that Timberline employees use equipment that had at one point been placed into commerce, but they note that they do not place it into commerce themselves. Defs.' Resp. at 7–8, ECF No. 24. The plain language of section 203(s)(1)(A)(i) makes no such distinction. Defendants' argument resembles the "coming to rest" theory, which has been rejected in the enterprise coverage context as inconsistent with the amended text of the FLSA, as explained above in section II. B. 1.

Defendants assert that *Polycarpe* is inapposite in that "materials" only applied to items provided to customers by the enterprise such as window shutters, paint, and alarms. *Id*. at 8. However, nowhere in *Polycarpe* did the court articulate that items must be provided to customers in order for enterprise coverage to attach. Furthermore, Defendants ignore two of the six consolidated cases in *Polycarpe*, namely *Bien-Aime v. Nanak's landscaping*, and *Polycarpe v. E&S landscaping*, in which defendant enterprises used mowers and other locally purchased business equipment in their business operations, without providing this equipment to customers. *Id*. at 1225. The Eleventh Circuit directed the district court on remand to consider whether the equipment had moved through interstate commerce to determine whether the landscaping companies were covered enterprises. *Id*. at 1228.

Defendants assert that *Marshall* is inapposite because it is unclear whether the enterprise equipment in that case was purchased out of state. *Marshall v. Brunner*, 668 F.2d 748, 751 (3d Cir. 1982); Defs.' Resp. at 9, ECF No. 24. However, the purchase location is irrelevant to decide the question of enterprise coverage. The third circuit relied on the stipulated fact that the equipment was *manufactured* out of state, and thus had moved through commerce. *Marshall*, 668 F.2d at 749.

- 19 -

Defendants argue that Timberline's engagement in commerce, if any, is "de minimis" and thus insufficient to support enterprise coverage under the Act. Defendants cite to the Sixth Circuit's decision in *Hunter*, which is not applicable here. *Hunter v. Madison Ave. Corp.*, 174 F.2d 164, 167 (6th Cir. 1949), cert. denied, 338 U.S. 836 (1949). In *Hunter*, the defendant enterprise owned and operated an office building occupied by a variety of tenants. The defendant enterprise collected and sold tenant waste paper into interstate commerce. *Id*. The court held that the paper collection and sale was an incidental, "de minimis" component of an otherwise fundamentally interstate business, and thus did not constitute "production of goods for commerce" under the Act. *Id.* at 165.

At the time the *Hunter* decision was published, "engage[ment] in commerce or the production of goods for commerce" were the only statutory bases for enterprise coverage. However, the 1961 amendment added the "handling clause," expanding the scope of enterprise coverage to business that were otherwise locally focused. *Polycarp* at 1220. In 1974, Congress further amended the Act, substituting the word "or" for the word "including" immediately preceding the handling clause. *Donovan v. Scoles*, 652 F.2d 16, 20 (9th Cir. 1981). This evinced a clear intent to create a second, independent basis for enterprise coverage beyond the production of goods for commerce. *Id*. It is this precise distinction between "production of goods for commerce" and "handling goods and materials that have moved in interstate commerce" that caused the court in *Williams v. Hooah Security Serv*. to properly decline to extend *Hunter* when construing the current version of section 203(i). *Williams v. Hooah Sec. Servs. LLC*, No. 09-02376-STA-TMP, 2011 WL 5827250, at *1 (W.D. Tenn. Nov. 18, 2011). Thus, the "de minimus" doctrine does not apply here. Defendants cite to no precedent applying the "de minimis" doctrine to the handling clause.

Defendants' reliance on *Houchin* and *Thorne* is also misplaced. *Houchin v. Thompson*, 438 F.2d 927, 928-29 (6th Cir. 1970); *Thorne v. All Restoration Servs., Inc.*, 448 F.3d 1264, 1266 (11th Cir. 2006). Both of these cases address *individual* coverage under the act, whereas section 203(s)(1) specifically addresses *enterprise* coverage, which is our concern here.

Defendants cite to various other precedent for the general proposition that the 1949 amendment of subsection (j) limited the scope of the FLSA. *See Mitchell v. Moore*, 241 F.2d 249, 250 (6th Cir. 1957); *Hodgson v. Ewing*, 451 F.2d 526, 528 n.2 (5th Cir. 1971). However, Defendants fail to address the amendments to subsection (s)(1), which is the subsection at issue here.

It is undisputed that Timberline operates a business wholly within the state of Michigan. Pl. Mot. at 2. It is also undisputed that Timberline uses logging equipment, including harvesters and forwarders that are manufactured out of state. This equipment has "moved in . . . commerce" under 203(s)(1). Further, Timberline's use of this equipment is not as an incidental consumer. Rather, the equipment is integral to its business operations and bears a "significant connection to its commercial purpose." *Polycarpe*, 616 F.3d 1217. Therefore, Timberline is a covered enterprise under the Act.

**B.**

Here, the Forestry Exemption is inapplicable as Defendants concede that Timberline employs more than eight employees engaged in felling operations during each workweek of the Investigation Period. Defs.' Resp. at 16; 29 U.S.C. § 213(b)(28). Defendants seek to exclude employees who are allegedly exempt from the FLSA such as drivers and mechanics. As explained below at sections III. C.–E., no Timberline employees are exempt. Furthermore, excluding such employees from the Forestry Exemption calculation does not comply with case

law, the plain language of the statute, and the Code of Federal Regulations. All employees count toward the eight employee total irrespective of whether they are engaged in exempt activities, or in a combination of exempt and non-exempt activities. 29 C.F.R. § 788.13 (citing *Woods v. Lumber Co. v. Tobin*, 199 F.2d 455 (C.A. 5)); *Camargo v. Trammell Crow Interest Co.*, 318 F. Supp. 2d 443, 447 (E.D. Tex. 2004). Therefore, the Forestry Exemption is inapplicable.

### C.

Here, it is apparent that the Agricultural Exemption is also inapplicable, as Timberline's operations do not fall within primary or secondary statutory meaning of agriculture. 29 U.S.C. § 213(b)(12); *Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 762 (1949). Forestry and lumber operations are explicitly identified in the secondary meaning of agriculture as other "practices" that can be considered farming *only* if performed by a farmer as incident to or in conjunction with farming operations. 29 U.S.C. § 213(b)(12). If such forestry operations constituted farming under the primary definition of agriculture, there would be no reason to include them under other "practices" incident to farming in the secondary definition of agricultural. Defendants have never contended that Timberline engages in any farming operations. Thus, Timberline's timber felling operations cannot possibly be incident to or in conjunction with farming operations. Therefore, the Agricultural Exemption does not apply.

### D.

The Administrative Employees Exemption also does not apply. It applies to, *inter alia*, bona fide administrative employees "compensated on a salary or fee basis at a rate of net less than $455 per week . . ." 29 C.F.R. § 541.200. It undisputed that Lorrie Grubbe, the only employee alleged to be exempt under this exemption, is paid on an hourly basis, not a salary basis. Payne Tr. at 96; Empl. Hrs. and Gross at 1, 26, 51. Defendants advance no argument

explaining how the Administrative Exemption applies despite the clear language of 29 C.F.R. § 541.200. Therefore, the Administrative Employee Exemption is inapplicable.

**E.**

Timberline drivers are not covered by the Motor Carrier Exemption. It is undisputed that Timberline trucks do not cross state lines. Def. Mot. Ex. DX 2, ¶ 4 (Payne Aff.), ECF No. 19-3; Pl.'s Mot. at 16–17. Nor does Timberline's intrastate transportation of timber constitute a "practical continuity of movement" into interstate commerce. To the contrary, the final destination of the timber is the Michigan mills to which they are delivered. Payne Aff. ¶ 4; Pl.'s Mot. at 16– 17. Whether or not the mills then process timber into paper for interstate sale does not affect the analysis. *Roberts v. Levine*, 921 F.2d 804, 816 (8th Cir. 1990) (shipper of raw soybeans to intrastate processor had no intent for shipping interstate where processor shipped soybean meal and soybean oil). Thus, Timberline's truck drivers fall outside of the plain terms of the Motor Carrier Exemption and the corresponding provision in the Code of Federal Regulations.

Defendants argue that *any* DOT regulation of Timberline truckers renders them subject to the Secretary's power for the purposes of the Motor Carrier Exemption. This is at odds with the plain language of the statute which provides that the Secretary has such power only with respect to motor carriers transporting passengers or goods in interstate commerce. 49 U.S.C.A. § 13501.

Defendants cite *Finn* for the proposition that any DOT regulatory authority renders Timberline drivers subject to the Motor Carrier Exemption. *Finn v. Dean Transp., Inc.*, 53 F. Supp 3d 1043 (M.D. 2014) ("Finn's concession that the DOT had 'some regulatory authority' over his work as a driver is, standing alone, dispositive of the issue.") The court in *Finn* found the Motor Carrier Exemption applicable where the motor carrier was required to maintain a CDL

- 23 -

license and had a DOT registration number. *Id*. at 1057. Defendants rely on these same facts in asserting the applicability of the Motor Carrier Exemption. Def. Mot. at 16.

The argument is misguided. The Secretary's authority to issue CDL licenses is not co-extensive with his authority to establish maximum hours under the Motor Carrier Exemption. The scope of the former is broader. 49 C.F.R. § 383.3(a) sets forth the applicability of the Commercial Driver's License Standards: "the rules in this part apply to every person who operates a commercial motor vehicle (CMV) in interstate, foreign, *or intrastate commerce*, to all employers of such persons, and to all states." 49 C.F.R. § 383.3(a) (emphasis added).

Clearly, the scope of CDL licensing authority is broader than the authority to establish maximum hours under the Motor Carrier Exemption, which extends to commercial vehicles in interstate and foreign commerce, but not *intrastate* commerce. Furthermore, the motor carrier in *Finn* carried "about 10% of 'interstate goods.'" 53 F. Supp 3d at 1057. Thus, the motor carrier was squarely within the terms of the Motor Carrier Exemption, and Timberline is not.

Finally, Defendants argue that it is inconsistent to find Timberline to be engaged in interstate commerce for the purposes of enterprise coverage under Sections 203 and 207, and to find it is not so engaged for the purposes of the Motor Carrier Exemption under Section 213(b)(1). Def. Mot. at 11–12. Defendants overlook the fact that the FLSA sets forth two distinct avenues for enterprise coverage, only one of which is subject to the Motor Carrier Exemption. 29 U.S.C. § 203(s)(1(A)(i) provides that an "enterprise engaged in commerce or in the production of goods for commerce means an enterprise that has employees engaged in commerce or in the production of goods for commerce, *or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person*. 29 U.S.C. § 203(s)(1)(A)(i).

Clearly, the scope of enterprise coverage is broader than the scope of the Motor Carrier Exemption, which applies only to motor carriers transporting passengers or goods through interstate commerce. 49 U.S.C.A. § 13501. As explained in section III. A. above, Timberline is subject to enterprise coverage under the "handling clause" of 29 U.S.C. § 203(s)(1)(A)(i), as its employees handle goods or materials that have previously moved in interstate commerce. Specifically, Timberline employees use commercial equipment manufactured outside the state. This fact is sufficient to establish enterprise coverage as explained above. However, this fact does not establish the applicability of the Motor Carrier Exemption, as Timberline drivers do not transport passengers or goods into interstate commerce, or in a "practical continuity of movement" into interstate commerce. 49 U.S.C.A. § 13501; 29 C.F.R. § 782.7. Therefore, the Motor Carrier Exemption does not apply.

## IV.

### A.

The FLSA requires all non-exempt employees to be paid for time in excess of forty hours per workweek at a rate not less than one and one-half times their regular rate. 29 U.S.C. § 207 (a)(1). The FLSA also requires covered enterprises to maintain records of hours worked and wages paid. 29 U.S.C. § 211(a). Wage and Hour is charged with setting forth recordkeeping regulations, which require covered employers to keep a regular hourly pay rate for all workweeks subject to overtime. 29 C.F.R. § 516.2(a).

Defendants admit that they do not record overtime hours worked for most employees, do not compute regular rates for employees, and have never paid an overtime wage of one and one-half times the regular rate for hours worked beyond forty. Payne Transcript at 168–170, 280.

- 25 -

Therefore, Defendants are in violation of the FLSA overtime and recordkeeping provisions. 29 U.S.C. §§ 207 (a)(1), 211(a).

**B.**

The burden of proof with respect to back wages is initially on the Plaintiff. *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680 (1945).

> [A]n employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as *as a matter of just and reasonable inference.* The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Id.* (emphasis added). Plaintiffs are not limited to proving the number of hours worked through written time records. *Bean v. Dough & Matthew Home Remodeling*, LLC, No. 14-cv-12536, 2015 WL 1728383, at *3 (E.D. Mich. Apr. 15, 2015); *see also Bueno v. Mattner*, 829 F.2d 1380, 1387 (6th Cir. 1987). Employee testimony or citation to the factual record, including depositions, is sufficient to satisfy Plaintiff's burden of proof. *Id*.; Fed. R. Civ. P. 56(c)(1)(a). Plaintiff's estimates need not be exact to survive Defendants' motion for summary judgment, though they cannot be overly speculative. *Bean*, 2015 WL 1728383, at *3; *Monroe v. FTS USA, LLC*, 763 F. Supp. 2d 979, 989 (W.D. Tenn. 2011).

Employers are generally not liable to employees for compensation for activities including "1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities . . . and 2) activities which are preliminary to or postliminary to said principal activity or activities." 29 U.S.C. § 254(a). Notwithstanding the provisions of subsection 254(a), such non-compensable activities are compensable if there is "a custom or practice in effect" at the place of employment to compensate for such time. 29 U.S.C. § 254(b). This section

has been interpreted as precluding any offset for meal breaks or drive time to and from work in the computation of employee's compensable time absent an agreement between employer and employees. 29 C.F.R. § 778.320(b); *Alonso v. 144 Ninth Gotham Pizza, Inc.*, No. 12CV3133 (DLC), 2016 WL 4257526, at *3 (S.D.N.Y Aug. 10, 2016).

## C.

## 1.

Here, Defendants fail to meet their burden under *Mt. Clemens* to produce evidence to negate Plaintiff's estimates. Defendants take issue with Mr. Wrona's calculation of a regular rate, which "resulted in an unsupportable and overinflated assessment." Def. Mot. at 17. Specifically, Defendants contend that certain payments and supplemental benefits should be offset against overtime due. *Id*.

Defendants note that Timberline's employee compensation packages included drive to work time and lunch time, which is ordinarily non-compensable under Section 254(a) of the Portal to Portal Act. Def. Mot. at 2, 4, 17, 18, 25; 29 U.S.C. § 254(a).   Defendants overlook Section 254(b), however, which provides that such time is nonetheless compensable if there is "a custom or practice" in effect to compensate for such time. Defendants did establish a custom or practice to compensate for such time. Def. Mot. at 2, 4, 17, 18, 25. Defendants cannot now offset this compensation against overtime due. 29 C.F.R. § 778.320(b); *Alonso*, 2016 WL 4257526, at *3 (precluding any offset of meal breaks or drive time to and from work in the computation of employee's compensable time absent an agreement between employer and employees). As Timberline established a custom or practice of paying for non-compensable time such as drive to work time and meal time, such time became compensable and is properly subject to the overtime provisions of the Act. *See* 29 U.S.C. § 254(b).

Where Plaintiff has carried his burden by providing evidence of the amount of overtime worked and back wages due "*as a matter of just and reasonable inference,*" Defendants must respond by producing its own evidence of the precise amount of time worked, or by producing evidence to negate the reasonableness of the inference. *Mt. Clemens*, 328 U.S. 680 (1945).

Defendants produced evidence as to the precise amount worked for hourly employees, but not for non-hourly employees, nor did they track a "regular rate" for all employees. Payne Tr. at 168–69, 172–73. Thus, they cannot satisfy their burden under *Mt. Clemens*. 328 U.S. 680. Nevertheless, the court's holding in *Mt. Clemens* presupposed that Plaintiff proved the overtime due "*as a matter of just and reasonable inference." Id.* Accordingly, the Court must independently assess the justness and reasonableness of Plaintiff's data and calculation methods before granting summary judgment for Plaintiff as to damages. *Id*.

### 2.

Investigator Wrona calculated overtime wages due to hourly employees based on payroll records produced by the Defendants *as well as interviews with employees*. Wrona Decl. ¶¶ 10–17; Wage and Hour Form 55. Thus, it is undisputed that Defendants maintained records of hours worked for hourly employees. *Id*.

With respect to these hourly employees whose hours were recorded by Timberline in its payroll journal, it is unclear why Investigator Wrona relied to *any* extent on interviews with employees when calculating back wages, as there appears to be no allegation of inaccuracy with respect to the payroll journal records. Further, it is unclear from the record to what extent Mr. Wrona did in fact rely on employee interviews, whether the data obtained from such interviews contradicted the data obtained from the Payroll Journal, and which one was used in his

calculations. Finally, it is unclear from the record what portion of the $468,595.08 of overtime allegedly due is attributable to hourly employees specifically.

Accordingly, the parties will be ordered to submit supplemental briefing with respect to the hourly employees. The Court cannot determine whether Plaintiff has proved the overtime due as a matter of "just and reasonable inference" without more information. *Mt. Clemens*, 328 U.S. 680.

With respect to all hourly employees, to the extent possible Plaintiff shall submit its supplemental brief in accordance with the following:

- Provide the names of each employee paid on an hourly basis.

- Provide the amount of overtime due for each such employee, on an individual basis.

- Provide the total amount due to hourly employees as a group.

- Perform these calculations *solely* with reference to the data provided in the Payroll Journal produced by the Defendants, and the applicable one and one-half times multiplier for hours worked beyond forty pursuant to 29 U.S.C. § 207 (a)(1).

- To the extent that such calculations cannot be made solely with reference to the hours and rates contained in the Payroll Journal, explain the reason(s) why not.

- Specify any instances in which Plaintiff relies on data from employee interviews in calculating the above for each specific hourly employee. To the extent the data obtained from the employee interviews is inconsistent with data contained in the payroll journal, set forth 1) what the total amount due for that employee is using the employee interview data, and 2) what the amount would be using only the data in the Payroll Journal.

- Include specific citations to the factual record where applicable.

Defendants shall respond to Plaintiff's supplemental brief in accordance with the following

- With respect to the calculations made by Plaintiff solely with reference to the Payroll Journal data and the multiplier contained in 29 U.S.C. § 207 (a)(1): assert any specific disagreement with Plaintiff's arithmetic.

- With respect to calculations made by Plaintiff with reference to data obtained in employee interviews: assert any disagreement with the accuracy of the data itself, or with Plaintiff's arithmetic.

**3.**

Some employees were not paid a straight hourly wage, or were paid a combination of an hourly wage, day, cord, piece, and/or load rate. Pl.'s Mot. Ex. I (Payroll Journal), ECF No. 18-10.

With respect to employees paid on a cord/piece, day, or load rates, Defendants admit they neither maintained records for most of these employees nor computed a regular rate. Payne Aff. at ¶ 11-12; Payne Tr. at 168-170. To the extent Defendants did maintain hours for such employees, they admitted such hours are only rough estimates, not actual hours worked, and are only "just a number." Payne Tr. at 169–70; Answer ¶ VI. Thus, Defendants failed to meet their burden under *Mt. Clemens*. 328 U.S. 680.

With respect to employees whose hours and regular rate were unknown, Mr. Wrona calculated hours based on information provided by employees, and calculated regular rates by dividing the gross pay by the estimated hours. Wrona Decl. ¶¶ 10-7. Defendants argue that fuel reimbursements, mobile phones, and other supplemental compensation should be offset against overtime due. Defendants cite to no authority explaining why they are entitled to such an offset, nor does it appear that any exists. However, Defendants should not be penalized for providing

gratuitous compensation by subjecting it to an overtime multiplier. Defendants would be improperly penalized to the extent that such supplemental compensation was included in the gross payment total which was then used to compute a regular hourly rate.

Employees provided information on their estimated hours via different methods. Some employees provided this information to Mr. Wrona during interviews. *Id*. Eight employees provided this information via declarations, including Phillip Eddy, Clinton Fletcher, Charles Hamilton, Jesse Jacobs, Ed Palmer, Kurt Stanbord, and Craig Straight. Employee Declarations. One employee provided this information during her deposition. *Id*. at Ex. U (Cheryl Klein Dep), ECF No. 18-22.


It is unclear from the record which employees were hourly, which were non-hourly, and what data source Mr. Wrona relied upon to make his calculations. Plaintiff could properly use data obtained through employee declarations and depositions, except to the extent it conflicts with Defendants' payroll journal. With respect to data obtained through employee interviews, Plaintiff has not provided a legal basis for using such data.

As this Court held in *Bean*, "plaintiffs' *testimony* can be sufficient to satisfy their burden of proof regarding the number of hours worked." *Bean v. Dough & Matthew Home Remodeling*, LLC, No. 14-cv-12536, 2015 WL 1728383, at *3 (E.D. Mich. Apr. 15, 2015) (Ludington, J.) (*citing Bueno v. Mattner,* 829 F.2d 1380, 1387 (6th Cir.1987). Rule 56(c)(1)(A) also provides that a party can meet its burden at summary judgment by citation to other parts of the factual record, including documents and electronically stored information. Fed. R. Civ. P. 56(c)(1)(a).

Plaintiff has not explained how the employees' interview responses to Mr. Wrona qualifies as "testimony" under *Bean* and *Bueno*, or how such information can otherwise satisfy

the Plaintiff's burden of proof under rule 56(c)(1)(a). *Id*; *Bean*, 2015 WL 1728383 at \*3; *Bueno,* 829 F.2d at 1387. The employee interviews are not in the record. The data provided during those interviews are only part of the "factual record" to the extent they are incorporated in Mr. Wrona's calculations. Plaintiff has cited no legal authority supporting the notion that such evidence satisfies its burden with respect to the hours worked.

On similar facts, the Southern District of New York considered whether employee responses to interviews and mail questionnaires could serve as the underlying basis for Plaintiff's damage calculation. *Reich v. Waldbaum, Inc.*, 833 F. Supp. 1037, 1050 (S.D.N.Y. 1993), rev'd in part, 52 F.3d 35 (2d. Cir. 1995). Although the court found such information admissible, it determined it could not give weight to the employee statements, which did not appear sufficiently reliable. *Id*. The court noted that "unlike a deposition or trial testimony, there is no affirmation of truthfulness, nor any necessity for accuracy." *Id.*

In contrast, the court held in *Solis* that employee interviews were sufficiently reliable to support the Secretary's motion for summary judgment as to overtime due where there was no other reliable evidence to review. *Solis v. A-1 Mortg. Corp*, 934 F. Supp. 2d 778, 814.

Here, the data relied upon by Plaintiff does not appear to be entirely reliable. In at least one case Plaintiff's calculation of overtime due has resulted in an unreasonable outcome. With respect to one employee workweek Mr. Wrona estimated 111.27 hours worked. Wrona Tr. at 57–58. It appears that this estimate was for William Axford for the pay period of Mar. 22, 2015. Empl. Hrs. & Gross at 64. It is unclear whether Mr. Wrona obtained the 111.27 hour figure from an employee, or whether he estimated those hours himself based on the data available. Wrona Tr. at 57–58.

- 32 -

> Q.     Okay. Is it possible that the hours worked were actually not provided to you and that you created them by dividing 2,448 by 22 dollars per hour and came up with that 111 figure?
>
> A.     I would have to review the records. I'm not saying that's - - it could be a possibility. Sometimes I have to do that, yes.
>
> Q.     Okay.
>
> A.     Sometimes I have to extrapolate the hours based on the gross divided by their hourly wage. So that could be a possibility, yes.
>
> Q.     And the reason I ask is that 111.27 hours in a workweek is 22.25 hours per day. That doesn't seem to be likely. Have you ever run into an employee that works that many hours in a day per week?
>
> A.     It is unlikely.

*Id.* Mr. Wrona's response here is inconsistent with his Declaration in which he indicated that employee hours were reconstructed via employee interviews. Wrona Decl. ¶ 17-18. Mr. Wrona also explained that Mr. Axford was a special case in that he was previously paid an hourly rate until it switched to a daily and cord rate in July 2014, after which he no longer maintained hours worked. *Id*. Mr. Wrona indicated that he used the average hours worked for Mr. Axford for weeks in which records were maintained to estimate hours worked for weeks in which records were not maintained. *Id*. This explanation is also inconsistent with his deposition responses above, in which he indicated that he sometimes extrapolated hours based on gross pay and hourly wage, and that he may have also done so in computing the 111.27 hour total. Wrona Tr. at 57–58.

Based on the factual record and the briefing, it is unclear what data sources and calculation methods Mr. Wrona used to determine the overtime owed to non-hourly employees and employees paid a combination of hourly and non-hourly rates. The record reveals incomplete and inconsistent answers to this question and suggests that different data sources and calculation methods were used depending on the employee and workweek at issue. Furthermore, the deposition testimony above reveals, and Mr. Wrona himself admitted, that his calculation methods resulted in unreasonable or "unlikely" results in at least one case. *Id*.

- 33 -

Therefore, the Court cannot grant Plaintiff's Motion for Summary Judgment with respect to damages in light of the standard set forth in *Mt. Clemens*, which requires that Plaintiff's uncontroverted evidence of overtime due must be based on "just and reasonable inference." *Mt. Clemens*, 328 U.S. 680.

Accordingly, the Court will direct supplemental briefing with respect to the issue of damages for non-hourly employees, and employees paid a combination of hourly and non-hourly rates.

To the extent possible, Plaintiff shall submit its supplemental brief in accordance with the following:

- Identify the names of employees paid on a strictly non-hourly basis.

- Identify the names of employees paid any combination of hourly, day, cord, piece, and/or load rates.

- Identify, for each employee, the source of the data or the source of the estimate relied upon by Mr. Wrona to calculate hours worked including but not limited to: the payroll journal, timecards, employee declarations, depositions, or employee interviews.

- To the extent Defendants provided data on hours worked for these employees, and Mr. Wrona chose to rely on another source, so indicate, explaining why.

- To the extent no specific data source or estimate was available, and Mr. Wrona had to independently calculate an estimate based on other available data (such as the instances described in Paragraphs 17–18 of his declaration), so indicate.

- 34 -

- To the extent that supplemental compensation such as fuel reimbursements and mobile devices were included in the gross wage totals used by the Investigators to compute a regular hourly rate, so indicate.

- Provide the total amount of overtime allegedly due for each specific employee paid on a non-hourly or combination basis.

- Provide the total amount of overtime allegedly due for all such employees as a group.

- Provide the legal basis for using data obtained through Employee Interviews to estimate hours worked in lieu of employee depositions, declarations, other sworn testimony, or citations to the factual record.

Defendants are directed to reply to Plaintiff's supplemental brief in accordance with the following:

- Assert any specific disagreement with the accuracy or authenticity of the data sources used by Mr. Wrona, citing to specific facts in the record where Defendants have provided evidence to contradict those data sources or calculation methods.

- Do not re-assert the theory that the overtime should be offset by drive to work time, lunch time, fuel reimbursements, mobile phones, or similar supplemental compensation.

- Respond to plaintiff's legal basis for using Employee Interviews to estimate hours worked.

**V.**

**A.**

29 U.S.C. §216(b) provides that an employer who violates section 206 or 207 shall be liable for liquidated damages in an amount equal to the unpaid overtime compensation. 29 U.S.C. §216(b). However,

> If the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title

29 U.S.C. § 260.

The employer bears the substantial burden of establishing this affirmative defense. *Dole* 942 F.2d at 968 (6th Cir. 1991). The employer must show both a subjective belief that it was compliant with the FLSA as well as an objectively reasonable basis for that belief. *See Samson v. Apollo Res., Inc.*, 242 F.3d 629, 640–41 (5th Cir. 2001); *Elwell v. Univ. Hosps. Homecare Servs.*, 276 F.3d 832, 841 (6th Cir. 2002). To show subjective good faith, an employer must show "an honest intention to ascertain and follow the dictates of the act." *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 908 (3d Cir. 1991) (citing *Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 129 (3d Cir. 1984) (abrogated on other grounds). An employer who acted negligently, but not wilfully, in misclassifying an employee will not be able to satisfy the good faith or reasonableness requirements. *See id.*; *Elwell*, 276 F.3d at 842.

An employer must take affirmative steps to ascertain the Act's requirements. *Martin v. Indiana & Michigan Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004). An employer may, but is not required to, rely on the advice of counsel provided that counsel is fully informed about the roles of all potentially exempt employees, counsel provides advice that is reasonable, and the employer adheres strictly to that advice. *Townley v. Floyd & Beasley Transfer Co.*, No. 88-AR-

0907-S, 1989 WL 205342, at *4 (N.D. Ala. Dec. 8, 1989); *Cook v. Carestar, Inc.*, No. 2:11-CV-00691, 2013 WL 5477148, at *12 (S.D. Ohio Sept. 16, 2013).

### B.

Here, Defendants fail to meet their burden to establish the affirmative defense of good faith and reasonableness. Defendants mischaracterize the burden of proof with respect to the defense of good faith and reasonableness, frequently citing investigator Wrona's failure to determine whether Timberline acted reasonably and in good faith. Def. Mot. at 21. However, the burden to establish this defense is on Defendants, not Plaintiff or its investigator. *Dole*, 942 F.2d at 968 (6th Cir. 1991).

Defendants also seem to confuse the standard for willfulness under section 216(a) with the standard for good faith and reasonableness under section 216(b) and section 260. Defendants note that there is "no evidence in the record of any alleged concealed violations as suggested by the government." Def. Resp. at 19. A lack of willfulness on the part of Defendants does not establish the affirmative defense of a good faith, reasonable belief that Timberline was in compliance with the FLSA. *Elwell*, 276 F.3d at 842. (an employer who acted negligently, but not wilfully, in misclassifying an employee will not be able to satisfy the good faith or reasonableness requirements). Rather, the defense requires *affirmative* steps to ascertain the Act's requirements. *Martin,* 381 F.3d at 584 (6th Cir. 2004).

Defendants' single inquiry to Timberline's accountant falls well short of meeting this burden. Mr. Rooyakker's advice was at most an opinion with respect to the general applicability of the Agricultural Exemption to Timberline's operations. Rooyakker Tr. at 61–62. Mr. Payne could not reasonably rely on that opinion with respect to all employees performing varying duties including administration and transportation. Mr. Payne made no follow up inquiry to

determine the applicability of the exemption to *each* employee based on their individual duties. *Martin*, 381 F.3d at 584–85. Furthermore, Mr. Payne admitted that he in fact did *not* believe truck drivers were agricultural employees. Payne Tr. at 306.

Defendants do not establish whether they made a good faith and objectively reasonable determination that the truck drivers were subject to the Motor Carrier Exemption. Mr. Payne read parts of U.S. DOL Fact Sheet #19 on the Motor Carrier Exemption, which he believed applied to his truck drivers. Payne Tr. at 351–54. The Fact Sheet indicates that the Exemption applies to Motor Carriers engaged in interstate commerce. Fact Sheet at 1. The fact sheet further indicates that interstate commerce means "across state or international lines." *Id*.

Admittedly, it is not intuitive that commerce has a broader meaning for the purposes of enterprise coverage under section 207 than it does for the purposes of the Motor Carrier Exemption under section 213(b)(1). As explained above, Timberline is a covered enterprise under the Act, though its drivers are not subject to the Motor Carrier Exemption. Thus, it may be objectively reasonable for a covered employer to believe its drivers are covered by the Motor Carrier Exemption.

However, Defendants do not establish that Mr. Payne in fact *did* make a good faith determination that the Motor Carrier Exemption applied *at the time he developed Timberline's compensation structure*. Mr. Payne did not recall whether he read the fact sheet before the initiation of the DOL investigation. Payne Tr. at 351–354. The fact that Defendants advance the Motor Carrier Exemption theory in their motion is irrelevant to the determination of whether Mr. Payne made a good faith, reasonable determination that Timberline was in compliance with the FLSA when he developed and maintained Timberline's compensation structure.

Finally, Defendants consistently point out that Timberline's compensation scheme resulted in compensation at or above the industry mean. Def. Mot. at 2, 4, 17, 25. Defendants further assert that awarding liquidated damages would be "unjust and inequitable", resulting in "windfall" payments to employees which Congress intended to avoid. *Id*. at 21, 25. This argument confuses the extent of the Court's discretion with respect to awarding liquidated damages. 29 U.S.C. § 216(b) provides that "*if* the employer shows to the satisfaction of the court" that it acted reasonably and in good faith "the court may, in its sound discretion, award no liquidated damages or award any amount thereof." 29 U.S.C. § 216(b). Thus, Defendants must first carry their burden to establish the affirmative defense before the Court has any discretion to decline to assess liquidated damages. *See Dole*, 942 F.2d at 968 (6th Cir. 1991). Whether or not Timberline employee compensation exceeds industry norms does not affect the analysis. Defendants have failed to carry their burden.

Accordingly, Defendants will be assessed liquidated damages. It remains to be determined what damages will be assessed for unpaid overtime. Liquidated damages will be assessed in an equal amount.

## VI.

29 U.S.C. § 217 authorizes district courts to enjoin violations of the Act. This discretion is not unbridled, and due consideration must be given to the fact that the court is enforcing a public, not a private right. *Martin v. Funtime Inc.*, 963 F.2d 110, 113 (6th Cir. 1992). In particular, courts are directed to consider the likelihood of repeat violations.

Here, Defendants acknowledge that

they have maintained Timberline's pay structure throughout this litigation because, for the reasons stated in Defendants' Motion for Summary Judgment,

> Defendants continue to assert their good faith belief that the FLSA does not apply to their wholly intrastate business, or that exemptions apply to eliminate or substantially reduce any obligation to pay overtime.

Def.s' Resp. Mot. Amend at 3, ECF No. 22. As determined above, Timberline is a covered enterprise, its pay structure violates the Act, and none of the employees during the investigation period are exempt. Accordingly, the Court will enjoin Defendants from violating the overtime and recordkeeping provisions of section 7, 11, and 15 of the Act.

## VII.

### A.

Plaintiff served supplemental discovery requests on Defendants on October 11, 2016, before the close of discovery, seeking "payroll records through the present." Def. Resp. at 3, ECF No. 22. Defendants objected to discovery beyond the Investigation Period. *Id*. Defendants ultimately agreed to supplemental discovery for the post-investigation period. *Id*. at 4. Additional employees were revealed in the supplemental discovery as a result of hiring after the Investigation Period. *Id*. Defendants served said discovery on April 3, 2017. *Id*. at 3.

Defendants acknowledge, and the supplemental discovery confirms, that

> they have maintained Timberline's pay structure throughout this litigation because, for the reasons stated in Defendants' Motion for Summary Judgment, Defendants continue to assert their good faith belief that the FLSA does not apply to their wholly intrastate business, or that exemptions apply to eliminate or substantially reduce any obligation to pay overtime.

Id. at 3. Plaintiff filed the instant Motion to Amend on April 19, 2017, the same day it filed its Motion for Summary Judgment seeking to add additional employees. Mot. to Amend, ECF No. 16. The Motion seeks to

> amend Exhibit A attached to the original Complaint to reflect additional employees and former employees of Defendants identified during discovery to whom the Acting Secretary alleges Defendants failed to pay an overtime premium in violation of the Act, (2) amend paragraph VI of the Complaint to allege

- 40 -

additional recordkeeping violations of the Act, and (3) to amend paragraph II(B) of the Complaint to conform with facts identified during discovery.

Id.

### B.

Under Federal Rule of Civil Procedure 15, a court should "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[T]he thrust of Rule 15 is to reinforce the principle that cases should be tried on their merits rather than the technicalities of pleadings." *Moore v. City of Paducah*, 790 F.2d 557, 559 (6th Cir. 1986) (internal citations and quotations omitted). Factors that courts should consider when determining whether to grant leave to amend include "[u]ndue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment . . . ." *Hageman v. Signal L.P. Gas, Inc.,* 486 F.2d 479, 484 (6th Cir. 1973). "Decisions as to when justice requires amendment are left to the sound discretion of the trial judge[.]" *Robinson v. Michigan Consol. Gas Co. Inc.,* 918 F.2d 579, 591 (6th Cir. 1990).

### C.

Defendants oppose the motion to amend on three primary grounds: undue delay, prejudice, and futility. The Court will address each in turn.

Plaintiff requested payroll records "through the present" on October 11, 2016, well before the close of discovery, to which Defendants objected. Def. Resp. at 3. Such a request was timely. That Plaintiff did not move to compel or otherwise challenge the objection until several months

- 41 -

later does not render the request untimely. Plaintiff filed its Motion to Amend on April 19, 2017, sixteen days after receiving the supplemental discovery. The Motion was not untimely.

Defendants assert that the Motion is futile for the same reasons stated in Defendants' Motion for Summary Judgment. *Id*. The defenses asserted in Defendants' Motion for Summary Judgment have been rejected. Thus, the Motion to Amend is not futile.

Defendants assert that granting the Motion would prejudice their ability to respond to Plaintiff's Motion for Summary Judgment and to prepare for mediation and trial. *Id*. Plaintiff asserts no new legal theories in their Proposed Amended Complaint. To the extent Defendants believe the new employees listed in the Proposed Amended Complaint are not subject to the FLSA overtime provisions, Defendants will have ample opportunity to respond with any legal theories not foreclosed by this order. Defendants will be able to assert any defenses to alleged record keeping violations and any alleged inaccuracy in the government's calculations.

Plaintiff timely filed its discovery request and moved to amend based on the information contained therein. They have engaged in no bad faith conduct. Defendants will not be prejudiced by granting the motion. The Court has determined that the interest of justice requires granting leave to amend. Accordingly, Plaintiff's Motion to Amend will be granted.

## VIII.

### A.

Defendants produced a "Company Snapshot" for Timberline South LLC indicating that it had a USDOT Number as of January 7, 2016. Pl.'s Mot. at 3; Def. Resp. at 3. Defendants did not produce the "Company Snapshot" of Timberline Logging, Inc. which established that Timberline Logging, Inc. operated under the same DOT number, and now attaches this document to its

motion. Pl. Mot. at 3. Defendants also attached to its Motion for Summary Judgment an Affidavit of Jim Payne which stated in part that "All of Timberline's truck drivers are required to maintain Commercial Drivers Licenses ("CDLs"), which I understand to be subject to regulation by the U.S. Department of Transportation ("USDOT")." Payne Aff. ¶ 13–14.  Plaintiff moves to strike the Company Snapshot of Timberline Logging, Inc., paragraphs 13–14 of Jim Payne's affidavit, and those portions of Defendants' Motion for Summary Judgment that rely upon such evidence. Pl's Mot. to Strike at 1, ECF No. 26.

## B.

Federal Rule of Civil procedure 37(c) provides:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, *unless the failure was substantially justified or is harmless.*"

Fed. R. Civ. P. 37(c) (emphasis added).

When determining the appropriateness of the discovery sanction of exclusion of evidence under Rule 37(c), "the test is very simple: the sanction is mandatory unless there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless." *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 370 (6th Cir. 2010). A rule 26 violation is not harmless where it is prejudicial to the other party. *Sexton v. Uniroyal Chem. Co.*, 62 F. App'x 615, 620 (6th Cir. 2003).

## C.

As set forth in section III. E. above, the Motor Carrier Exemption is inapplicable to Timberline drivers. Neither the Company Snapshot nor the Affidavit affects that analysis. Thus, the Motion to Strike the portions of Defendants' Motion that rely upon such evidence is moot.

To the extent either document may become relevant for any other purpose in light of Plaintiff's Amended complaint, Plaintiff will have a full opportunity to develop the factual record. Thus, its interests are not prejudiced. Accordingly, the Motion to Strike will be denied.

**IX.**

Accordingly, it is **ORDERED** that Plaintiff's Motion for Summary Judgment, ECF No. 18, is **GRANTED** in part, Defendants' Motion for Summary Judgment, ECF No. 19, is **DENIED**, Plaintiff's Motion to Amend, ECF No. 16, is **GRANTED**, and Plaintiff's Motion to Strike, ECF No. 26, is **DENIED** as moot.

It is further **ORDERED** that the parties shall submit supplemental briefing on damages in accordance with sections IV. C. 2–3 above. Plaintiff shall submit its supplemental brief by November 6, 2017; Defendants shall respond by November 20, 2017.

It is further **ORDERED** that Defendants are enjoined from violating the overtime and recordkeeping provisions of section 7, 11, and 15 of the Act. 29 U.S.C. §§ 207, 211, 215.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: October 6, 2017

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 6, 2017.

s/Kelly Winslow
KELLY WINSLOW, Case Manager